IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THE UNITED STATES OF AMERICA | : | No. 3:21cv286 |
| by and for the use of TECHNIQUEX | : | |
| SPECIALTY FLOORING, INC., | : | (Judge Munley) |
| Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| PHILADELPHIA INDEMNITY | : | |
| INSURANCE COMPANY, | : | |
| Defendant | : | |

:::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## MEMORANDUM

This is an action filed by Plaintiff Techniquex Specialty Flooring, Inc.

("Techniquex") pursuant to the Miller Act, 40 U.S.C. §§ 3131–34, for breach of a

payment bond issued by Defendant Philadelphia Indemnity Insurance Company

("PIIC").[1]  Before the court is a motion for summary judgment filed by the

defendant.  Having been fully briefed and argued, this motion is ripe for

disposition.

**Background**

This dispute involves a construction project to renovate the Mission

Operation Facility at the Tobyhanna Army Depot in Tobyhanna, Pennsylvania.[2]

---

[1] The Miller Act requires Techniquex to pursue this matter "in the name of the United States for the use of the person bringing the action." 40 U.S.C. § 3133(b)(3)(A).

[2] Unless noted otherwise, the court cites to the defendant's statement of material facts ("SOF"), (Doc. 41-22), for facts which the plaintiff admitted in its response to the SOF, ("CSOF"), (Doc.

(Doc. 41-5, Subcont. Agreement, ECF p. 27).  To proceed with the renovation of this 210,000 square foot building, the United States Department of the Army executed a prime contract with Benaka, Inc. ("Benaka") and Benaka served as the prime contractor for the project. (Id.; Doc. 41-22, SOF ¶ 1).

On September 29, 2014, and pursuant to the Miller Act, PIIC issued a payment bond for the project on behalf of Benaka. (Doc. 41-22, SOF ¶ 2). Among other things, the bond obligated defendant as the surety to pay persons furnishing labor and materials to the project in the event Benaka failed to do so. (Id. ¶ 3).

Thereafter, pursuant to the prime contract, Benaka executed a subcontract with Techniquex. (Id. ¶ 1).  Techniquex and Benaka agreed that the plaintiff would furnish epoxy flooring work for the project as required by the subcontract. (Id.)  Work on the project was broken into six (6) phases: Phases A, B, C, D, E(a), and E(b). (Id. ¶ 4).  Techniquex completed Phases A, B, and C on the project on or before October 15, 2017. (Id. ¶ 5).

Under the subcontract, Techniquex would submit periodic payment applications to Benaka as the project moved forward. (See id. ¶ 6).  Per

---

46).  All facts from the record are construed in a light most favorable to plaintiff as the nonmoving party. See Daniels v. Sch. Dist. of Philadelphia, 776 F.3d 181, 187 (3d Cir. 2015)(citation omitted).

Techniquex, a dispute arose in April 2017, where Benaka reduced an invoice payment by approximately $95,000. (Doc. 45, B. Adelmann Decl. ¶ 3). Nonetheless, work on the floors of the Mission Operation Facility continued.  On August 18, 2017, Techniquex submitted Payment Application No. 7 for work on the project. (Doc. 41-22, SOF ¶ 6).  Techniquex also executed a waiver that was attached to Payment Application No. 7. (Doc. 45, B. Adelmann Decl. ¶ 2).  PIIC advances that Benaka approved and paid this application subject to waiver and release language that forecloses part of Techniquex's claim.  Techniquex takes the position that Payment Application No. 7 underbilled Benaka for labor and materials supplied in the amount of $241,316, which plaintiff attempted to recoup in later payment applications. (Id. ¶¶ 3, 8).  Techniquex asserts that it has not waived its claim to this amount.

On October 25, 2017, Techniquex submitted Payment Application No. 8 for work on the project. (Doc. 41-22, SOF ¶ 8).  Benaka rejected this application on November 9, 2017. (Id. ¶ 9).

In November 2017, Benaka informed Techniquex that work on the project was temporarily suspended due to delays unrelated to epoxy flooring. (Doc. 45, B. Adelmann Decl. ¶ 7). Techniquex removed its employees from the project and did not commence work on Phases D, E(a), and E(b). (Id. ¶¶ 6-7).

Techniquex then filed a bond claim with PIIC on January 4, 2018. (Doc. 41-22, SOF ¶ 10).  PIIC rejected the bond claim. (Id. ¶ 11).  Techniquex admits that it decided not to pursue this 2018 bond claim or litigation at that time. (Doc. 46, CSOF ¶ 13).  Techniquex advances that it operated under an assumption that it would remobilize and complete work later. (Doc. 41-8, Techniquex 30(b)(6) Dep., B. Adelmann 167:1-168:3).

The project apparently languished for various reasons.  But on June 11, 2020, Benaka contacted Techniquex to resume flooring work.  (Doc. 41-22, SOF ¶ 14).  On September 10, 2020, after COVID-19 interruptions, Techniquex's vice president, Caleb Wilhelm, travelled to the Tobyhanna Army Depot to meet with representatives from the depot and Benaka to walk the site, discuss the remaining scope of work, and schedule Techniquex's remobilization. (Doc. 45, B. Adelmann Decl. ¶ 11).

During this site visit, Wilhelm discovered dozens of epoxy containers in various sizes, which had been on the job site since 2017. (Id. ¶¶ 12–13; Doc. 44-23, Pl. Ex. 22, Photographs). At that time, Techniquex took the position that the materials were expired and needed to be removed and replaced as part of resuming work. (Id.)  In reporting back to Techniquex in an email, Wilhelm indicated that the job site was "too much of a mess to dig through[.]" (Id., C. Wilhelm Email 09/17/2020).  Per Techniquex, over the course of several hours,

Wilhelm manually lifted and carried the epoxy containers and placed them back on pallets. (Doc. 45, Decl. of B. Adelmann, Decl. ¶ 13).

The expired materials and other issues eventually soured the relationship between Techniquex and Benaka.  On November 4, 2020, Benaka terminated Techniquex from the project.  (Doc. 41-22, SOF ¶ 16).

After it was terminated, Techniquex resubmitted Payment Application No. 8 to Benaka on December 17, 2020 and simultaneously provided PIIC with notice of its second payment bond claim. (Id. ¶ 17). Per Techniquex, the resubmitted payment application and bond claim concerned the amount of $401,756.95, which included: 1) unpaid retainage of approximately $64,048.93; 2) the amount billed in the original Payment Application No. 8 in the amount of $96,391.31, and 3) $241,316.00 in underbilled items from Payment Application No. 7. (Doc. 45, Decl. of B. Adelmann ¶ 9).

On February 17, 2021, Techniquex filed this instant action seeking recovery of $401,756.95 from the payment bond issued by PIIC. (Doc. 1, Compl.).  After a period of discovery, PIIC filed the instant motion for summary judgment.  This matter is ripe for a decision.

**Jurisdiction**

Because this case is brought pursuant to the Miller Act, the court has jurisdiction pursuant to 28 U.S.C. § 1331. ("The district courts shall have original

jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.").

The court also has jurisdiction pursuant to the diversity statute, 28 U.S.C. § 1332.  Techniquex is a corporation organized under the laws of the State of Arizona with its principal place of business in Arizona. (Doc. 1, Compl. ¶ 2).  PIIC is a corporation organized under the laws of the Commonwealth of Pennsylvania with its principal place of business in Pennsylvania. (Id. ¶ 4, Doc. 22, Answer, ¶4).  Additionally, the amount in controversy exceeds $75,000.  Because complete diversity of citizenship exists among the parties and the amount in controversy exceeds $75,000, the court has an additional basis for jurisdiction over this case.  See 28 U.S.C. § 1332 ("district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different states[.]").

**Standard of Review**

PIIC has filed a motion for summary judgment.  Granting summary judgment is proper " 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " See Knabe v. Boury Corp., 114 F.3d 407, 410 n. 4

6

(3d Cir.1997) (quoting FED. R. CIV. P. 56(c)).  "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986) (emphasis in original).

In considering a motion for summary judgment, the court must examine the facts in the light most favorable to the party opposing the motion. Int'l Raw Materials, Ltd. v. Stauffer Chem. Co., 898 F.2d 946, 949 (3d Cir.1990).  The burden is on the moving party to demonstrate that the evidence is such that a reasonable jury could not return a verdict for the non-moving party. Anderson, 477 U.S. at 248.  A fact is material when it might affect the outcome of the suit under the governing law. Id.  Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Once the moving party satisfies its burden, the burden shifts to the nonmoving party, who must go beyond its pleadings, and designate specific facts by the use of affidavits, depositions, admissions, or answers to interrogatories showing that there is a genuine issue for trial. Id. at 324.

7

**Analysis**

The Miller Act governs construction projects for the federal government. Pursuant to the statute, "[b]efore any contract of more than $100,000 is awarded for the construction, alteration, or repair of any public building or public work of the Federal Government, a person must furnish to the Government" a performance bond and a payment bond, "which become binding when the contract is awarded." 40 U.S.C. § 3131(b).  The performance bond protects the government. See 40 U.S.C. § 3131(b)(1).  The payment bond protects "all persons supplying labor and material in carrying out the work provided for in the contract," i.e., subcontractors. 40 U.S.C. § 3131(b)(2).  As the prime contractor for the federal project in question, Benaka secured a payment bond from PIIC to address claims of subcontractors like Techniquex.

The Miller Act authorizes civil actions to recover from the payment bond, that is, it affords rights to persons furnishing labor or materials to a government project who go unpaid. See 40 U.S.C. § 3133(b).  Specifically, "[e]very person that has furnished labor or material in carrying out work provided for in a contract for which a payment bond is furnished… and that has not been paid in full within 90 days after the day on which the person did or performed the last of the labor…for which the claim is made may bring a civil action on the payment bond

8

or the amount unpaid at the time the civil action is brought[.]" 40 U.S.C. § 3133(b)(1). Techniquex proceeds against PIIC pursuant to this provision.

With the instant motion for summary judgment, PIIC argues that the complaint should be dismissed with prejudice because Techniquex's claim is barred by the Miller Act's one-year statute of limitations. In the alternative, PIIC argues that plaintiff waived all claims to payment for work performed through July 31, 2017. The court begins with PIIC's timeliness arguments.

### 1. Statute of Limitations

The Miller Act contains a statute of limitations. 40 U.S.C. § 3133(b)(4). An action brought to recover from the payment bond "must be brought no later than one year after the day on which the last of the labor was performed or material was supplied by the person bringing the action." Id. Techniquex filed this action on February 17, 2021.

In this case, there is a dispute between the parties as to the definition of "labor" as used in the Miller Act. Under PIIC's reading of the statute and view of the facts, Techniquex last performed labor on October 15, 2017, when it completed Phases A, B, and C and then demobilized at the direction of Benaka. Thus, PIIC argues that this matter is untimely. Techniquex takes the position that the work performed on September 10, 2020 by its vice president constitutes the last day of labor and that it filed this action in a timely manner.

9

At oral argument, the parties indicated and the court's research has confirmed that there are no cases from the United States Supreme Court or Third Circuit Court of Appeals interpreting the word "labor" as used in the Miller Act. But other federal appellate courts have interpreted the word "labor." There are some common principles found in these decisions.

First, "not all work on a government project qualifies as 'labor' under the Miller Act[.]" United States ex rel. Dickson v. Fid. & Deposit Co. of Md, 67 F.4th 182, 184 (4th Cir. 2023)("Dickson"). For example, the Fourth Circuit definitively limits the definition of "labor" to physical toil or its direct supervision, not mental toil. Id. at 187. Such an interpretation also excludes physical acts that do not involve exertion or toil, such as office or clerical tasks. See id. at 191. The Eighth Circuit similarly interprets "labor" in a manner requiring physical labor at the job site. U.S. for Use & Benefit of Olson v. W.H. Cates Constr. Co., 972 F.2d 987, 991 (8th Cir. 1992)("W.H. Cates").

Second, although the term "labor" generally includes physical work, the Eighth Circuit also interprets "labor" to include "professional supervisory work" as also being covered by the Miller Act, i.e., " 'skilled professional work which involves actual superintending, supervision, or inspection at the job site.' " Id. at 990 (quoting U.S. for Use & Benefit of Naberhaus-Burke, Inc. v. Butt & Head, Inc., 535 F. Supp. 1155, 1160 (S.D. Ohio 1982)); accord U.S. for Use & Benefit

of Am. Civ. Constr., LLC v. Hirani Eng'g & Land Surveying, PC, 58 F.4th 1250, 1254 (D.C. Cir. 2023)("Hirani").  Additionally, from W.H. Cates, onsite supervisory work of a project manager is within the purview of the Miller Act if the manager did some physical labor or might have been called upon to do some manual work in the regular course of their job.  972 F.2d at 991.

Third, these cases interpret "labor" in accordance with directives from the Supreme Court that the Miller Act is entitled to liberal construction to protect subcontractors. See id. at 990 (citing Clifford F. MacEvoy Co. v. U.S. for Use & Benefit of Calvin Tomkins Co., 322 U.S. 102, 107 (1944)); Hirani, 58 F.4th at 1252; but see Dickson, 67 F.4th at 195–200 (Floyd, S.J., in dissent)(criticizing the majority opinion for not following principles of liberal construction when it excluded "mental exertion" and "mental toil" from the definition of "labor").

Against the summary judgment record in this case, the court need not parse out the perfect definition of "labor" under the Miller Act to decide the motion.  Rather, pursuant to the above general principles from persuasive authority, the work performed by Techniquex's vice president on September 10, 2020 amounts to "labor" for purposes of the Miller Act.  Viewed in a light most favorable to Techniquex as the non-moving party, the plaintiff has proffered evidence that its vice president lifted multi-gallon buckets of epoxy material and stacked them on pallets. That is physical toil.  When he performed these tasks,

11

the job was not final.  His presence at the jobsite was designed to remobilize Techniquex's flooring installers for the completion of Phases D, E(a), and E(b) of the project. Techniquex expected to resume work. That is physical toil in furtherance of the subcontract for flooring.

PIIC argues that Wilhelm's tasks amount to taking an inventory. (Doc. 47, Def. Reply Br. at 1-2).  And, in <u>Dickson</u>, the Fourth Circuit found that a final inventory was not "labor," at least where the supervisor performed more clerical tasks. 67 F.4th at 191.  But, even if Wilhelm was taking an inventory in this case, the inventory involved lifting and stacking a number of large buckets of expired flooring material to move the job forward.  Summary judgment thus cannot be entered in favor of PIIC based on its statute of limitations arguments at this time.[3]

## 2. Waiver and Release

As an alternative argument, PIIC seeks summary judgment on a portion of Techniquex's claim against the payment bond.  Specifically, PIIC argues that Payment Application No. 7 contained a plainly worded and unambiguous waiver and release executed by Techniquex, which included the plaintiff's work through July 31, 2017.  PIIC thus argues that Techniquex cannot recover in this action for

---

[3] Techniquex also argues that equitable tolling applies in this matter if the last date of work was determined to be in 2017.  Based on the above analysis, the court need not reach this argument.

work performed before August 1, 2017. Techniquex counters that the waiver and release did not comply with the Miller Act and the plaintiff did not intend to waive its claim to $241,316.00 in underbilling when it submitted Payment Application No. 7.

The court begins with the terms of the documents. Techniquex submitted Payment Application No. 7 on August 18, 2017. (Doc. 41-9, Def. Ex. E). Attached to the payment application was a Conditional Waiver and Release on Progress Payment executed pursuant to an Arizona statute, ARIZ. REV. STAT. § 33-1008, ("August 2017 waiver and release").[4]  Some discussion of Arizona law is warranted along with the terms of this document. The statute referenced in the August 2017 waiver and release provides: "An owner or contractor by any term of their contract, or otherwise, may not waive or impair the claims or liens of other persons whether with or without notice except by their written consent[.]" ARIZ. REV. STAT. § 33-1008(A).

The August 2017 waiver and release provides: "On receipt by the undersigned of a check from BENAKA, Inc. in the sum of $ 61,939.36 payable to Techniquex Specialty Flooring, Inc. and when the check has been properly endorsed and has been paid by the bank on which it is drawn, this document

---

[4] Techniquex is an Arizona corporation with its principal place of business in Scottsdale, Arizona. (Doc. 1, Compl. ¶ 2).

becomes effective to release any Mechanic's Lien, **any state or federal statutory bond right**, any private bond right, any claim for payment and any rights under any similar ordinance, rule or statute related to claim or payment rights" that Techniquex had on the project. (Doc. 41-9, Ex. E)(emphasis added). The August 2017 waiver and release also includes the following limiting language: "This release covers a progress payment for all labor, services, equipment or materials furnished to the jobsite or to BENAKA, Inc. through 07/31/2017 only and does not cover any retentions, pending modifications and changes or items furnished after that date." (Id.)

To be effective under Arizona law, written waivers and releases must substantially follow the forms set forth by statute. ARIZ. REV. STAT. § 33-1008(A). The August 2017 waiver and release substantially conforms with Section 33-1008(D)(1), which applies to conditional progress payments, i.e., when "the claimant is required to execute a waiver and release in order to induce payment, and it becomes effective only after payment is received." United Metro Materials, Inc. v. Pena Blanca Props., LLC, 4 P.3d 1022, 1027 (Ariz. Ct. App. 2000). Moreover, despite the form language required under Arizona law, "[n]o statutory provision prohibits the use of partial releases[,]" such as where a party inserts "words in the waiver form that clearly reserve lien rights contrary to the express term of the lien waiver." See id., 4 P.3d at 1027. Although permitted by Arizona

14

law to vary from the forms, the August 2017 waiver and release mimics the form of Section 33-1008(D)(1) and Techniquex did not insert words reserving any rights other than for "any retentions, pending modifications and changes or items furnished after that date."

### a. Miller Act Waiver Requirements

Moving on from the discussion of its Arizona-specific terms, the question posed in this case is whether the August 2017 waiver and release forecloses recovery on some of Techniquex's Miller Act claim.  Pursuant to the Miller Act, "[a] waiver of the right to bring a civil action on a payment bond required under this subchapter is void unless the waiver is -- (1) in writing; (2) signed by the person whose right is waived; and (3) executed after the person whose right is waived has furnished labor or material for use in the performance of the contract." 40 U.S.C. § 3133(c).  Upon review, the August 2017 waiver and release clearly checks all three boxes.

In response to summary judgment, Techniquex argues that a Miller Act waiver must explicitly contain the words "Miller Act" to be effective. (Doc. 44 Pl. Br. in Opp. at 21).  At least one district court has held that such express language is necessary for an effective waiver of Miller Act claims. See U.S. for Use of DDC Interiors, Inc. v. Dawson Constr. Co., 895 F. Supp. 270, 274 (D. Colo. 1995), aff'd, 82 F.3d 427 (10th Cir. 1996)("At a minimum, an effective waiver of Miller

Act rights must include mention of the Miller Act and unambiguously express intention to waive the rights provided by it."). However, "[a] decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case." Camreta v. Greene, 563 U.S. 692, 709 (2011).

Instead, the court focuses on the statute. The Miller Act does not mandate that waivers contain explicit reference to the Miller Act, only that they be in writing, signed by the person waiving the right, and executed after labor and material have been furnished for use in the performance of the contract. And while the Miller Act is to be liberally construed, such a salutatory policy does not justify ignoring the plain words of the statute. See Clifford F. MacEvoy Co., 322 U.S. at 107. Moreover, Congress added the above waiver requirements to the Miller Act as part of the Construction Industry Payment Protection Act of 1999. See United States v. Zurich Am. Ins. Co., 99 F. Supp. 3d 543, 548 (E.D. Pa. 2015) (citing PL 106–49, August 17, 1999, 113 Stat. 231). If Congress wanted to include a requirement that written waivers contain specific reference to the Miller Act to protect subcontractors, it would have done so. Accordingly, there is no support for Techniquex's position in the text of the Miller Act.

**b. State Law Arguments**

Additionally, Techniquex argues that the August 2017 waiver and release is ineffective based on common law principles. (Doc. 44, Pl. Br. in Supp. at 22–23). In Miller Act litigation, it is appropriate to consider state contract law when addressing whether a release is valid. See U.S. for Use of Youngstown Welding and Eng'g Co. v. Travelers Indem. Co., 802 F.2d 1164, 1167 (9th Cir. 1986) (citing United States ex rel. United Elec. Corp. v. Nat'l Bonding & Accident Ins. Co., 711 F.2d 131, 133 n. 2 (9th Cir. 1983) (per curiam)).

The court has both federal question and diversity jurisdiction over this matter.  As a federal court sitting in diversity, the substantive law of Pennsylvania applies to the instant case.  Chamberlain v. Giampapa, 210 F.3d 154, 158 (3d Cir. 2000) (citing Erie R.R. v. Tompkins, 304 U.S. 64, 78 (1938)).  As such, both parties cite Pennsylvania contract law in arguing about the validity of the waiver and release and the court presumes that Pennsylvania law is applicable to these considerations.

Under Pennsylvania law, written releases are construed according to contract principles. See Sparler v. Fireman's Ins. Co. of Newark, N.J., 521 A.2d 433, 435 (Pa. Super. Ct. 1987).  "[T]he effect of a release is to be determined by the ordinary meaning of its language." Taylor v. Solberg, 778 A.2d 664, 667 (Pa. 2001)(citing Republic Ins. Co. v. Paul Davis Sys. of Pittsburgh S., Inc., 670 A.2d

614, 615 (Pa. 1995); Buttermore v. Aliquippa Hosp., 561 A.2d 733, 735 (Pa.

1989)).  If the language of the release is clear, the court looks no further, even if

the language is broad or general and no matter how improvident the agreement

may later prove to be for one of the parties. Republic Ins. Co., 670 A.2d at 615

(citing Buttermore, 561 A.2d at 735).  Moreover, the parties' release agreements

are the law of their case, absent fraud, accident, or mutual mistake.  Taylor, 778

A.2d at 667.

Techniquex argues that it was not the intent of the company to waive or

release claims for work in place that it had mistakenly omitted from payment

applications. (Doc. 44, Pl. Br. in Opp. 22–23).  In Pennsylvania, however, "the

intent of the parties to a contract is to be regarded as embodied in the writing

itself, and, as such, the entire agreement must be taken into account in

determining contractual intent." Binswanger of Pa., Inc. v. TSG Real Est. LLC,

217 A.3d 256, 262 (Pa. 2019)(citation omitted).  Furthermore, "a reviewing court

does not assume that contractual language is chosen carelessly, nor does it

assume that the parties were ignorant of the meaning of the language they

employed; thus, when a writing is clear and unequivocal, its meaning must be

determined only by its terms." Id.

Taking a step back, the August 2017 waiver and release is but one of

several waivers and releases executed by Techniquex to receive progress

payments from Benaka in the performance of the subcontract. (See e.g. Doc. 44-23, Pl. Ex. 23). Additionally, the terms of the August 2017 waiver and release do not exist on their own; Techniquex and Benaka were also governed by the subcontract agreement. Review of the subcontract agreement is necessary to appreciate Techniquex's intent. See Int'l Milling Co. v. Hachmeister, Inc., 110 A.2d 186, 191 (Pa. 1955)("[i]f contracting parties choose, they may express their agreement in one or more writings and, in such circumstances, the several documents are to be interpreted together, each one contributing (to the extent of its worth) to the ascertainment of the true intent of the parties.").

The subcontract agreement between Benaka and Techniquex contained specific terms regarding progress payments, certifications as to payment, and waivers. (Doc. 41-5, Benaka Subcontract Agreement, Subcontractor General Conditions Agreement, Art. XII, Payments, ¶¶ A-B). Those terms provided, in relevant part: "Subcontractor agrees that payment by the General Contractor constitutes a release of the General Contractor from all claims, liabilities, other than retainage, for any Work, services, material or equipment performed or provided during the period in which the payment relates. Acceptance of payment by the Subcontractor shall constitute a general release against the General Contractor, its surety, and the Owner." (Id. ¶ B, ECF p. 19). So, the parties really

executed multiple documents with express terms releasing Techniquex's claims to labor and materials supplied upon progress payments by Benaka.

Based on the clear language of the subcontract agreement, the intent of Benaka and Techniquex was to release Benaka upon each progress payment "from all claims, liabilities, other than retainage, for any Work, services, material or equipment performed or provided during the period in which the payment relates." (Id.)  Pursuant to equally clear provisions of the August 2017 waiver and release (chosen by the Arizona legislature to represent unambiguous terms), the intent of Benaka and Techniquex was to release Benaka relative to a "progress payment for all labor, services, equipment or materials furnished to" Benaka through July 31, 2017 with the exception of "any retention, pending modifications and changes or items furnished after that date." [5]  (Doc. 41-9, Ex. E).  These agreements provide clear and unequivocal terms.  Techniquex's arguments about its intent thus fall short.

In countering PIIC's reliance upon the August 2017 waiver and release, Techniquex also refers to its underbilling as an "accident" and a "mistake" and

_____

[5] Techniquex advanced at oral argument that the August 2017 waiver and release was not effective because Techniquex submitted a change to its schedule of values in November 2017. (Doc. 59, 04/23/2024 O.A. Trans. at 38). By executing the August 2017 waiver and release, Techniquex released claims with the exception of: 1) any retention; 2) pending modifications and changes; and 3) items furnished after July 31, 2017.  Although perhaps a modification, any proposed changes to a schedule of values sent in November 2017 would not be a *pending* modification at the time the August 2017 waiver and release was executed.

uses these terms interchangeably. The court thus considers whether a mistake could negate the express terms of the waiver and release.

In Pennsylvania, a mutual mistake occurs when the written instrument fails to set forth the true agreement of the parties at the time of formation and serves as a defense to the formation of a contract. See Hart v. Arnold, 884 A.2d 316, 333 (Pa. Super. Ct. 2005)(citations omitted). Techniquex, however, admits that its underbilling for labor and materials was based on its own mistake and not a mutual mistake. (Doc. 45, Decl. of B. Adelmann ¶¶ 3, 8). Generally, "[a] mistake will afford no basis for relief in rescinding a release if the mistake is not mutual." Roth v. Old Guard Ins. Co., 850 A.2d 651, 653 (2004)(citation omitted). But, there is an exception to the general principle denying relief for unilateral mistake: "when the non-mistaken party 'knows or has reason to know of the unilateral mistake, and [if] the mistake, as well as the actual intent of the parties is clearly shown, relief will be granted to the same extent as a mutual mistake.' " In re Allegheny Int'l, Inc., 954 F.2d 167, 180 (3d Cir. 1992)(quoting Lanci v. Metro. Ins. Co., 564 A.2d 972, 974 (Pa. Super. Ct. 1989))(additional citations omitted); see also Welsh v. State Emps. Ret. Bd., 808 A.2d 261, 265 (Pa. Commw. Ct. 2002). Reformation based on mistake requires a showing of "clear, precise and convincing" evidence. See Roth, 850 A.2d at 653 (citation omitted).

Facts supporting this exception are not in the record.  Rather, the record reflects that Benaka was not aware of Techniquex's purported mistake at the time that the August 2017 waiver and release was executed.  Based on emails in the record, Benaka was informed of the ostensible underbilling in November 2017 after it rejected Payment Application No. 8. (Doc. 41-11, C. Wilhelm email 11/08/2017, ECF p. 3). Techniquex has not provided evidence that Benaka knew of the plaintiff's mistake at the time the August 2017 waiver and release was executed.  "A unilateral mistake, which is not due to the fault of the party not mistaken, but to the negligence of the one who acted under the mistake, cannot be a basis for refusing to enforce the release according to its terms." Roth, 850 A.2d at 653.  Consequently, PIIC's motion for summary judgment on a portion of Techniquex's claim will be granted pursuant to clear and unequivocal release language.

**Conclusion**

For the reasons set forth above, PIIC's motion for summary judgment will be granted in part and denied in part.  PIIC's motion for summary judgment will be granted as to any part of Techniquex's Miller Act claim arising out of labor and material furnished to Benaka through July 31, 2017.  The motion for summary judgment will otherwise be denied for the portion of Techniquex's claim for any

retentions, pending modifications and changes, or items furnished to Benaka after July 31, 2017. An appropriate order follows.

**Date:** _10/22/24_

JUDGE JULIA K. MUNLEY
United States District Court